STROUD, Judge, concurring in part and dissenting in part.
I concur with the holding of the majority opinion as to the denial of propounder's motion to dismiss and agree that propounder, the named executor under the March will, was an aggrieved party with standing to appeal the trial court's order denying probate of the March will. I also concur with the majority opinion in its holding that summary judgment was properly granted for Ms. Jones on the issue of the testamentary capacity of Mr. Jones. However, I respectfully dissent as to the majority's holding regarding the grant of summary judgment to caveator, Jean Jones ("Ms.Jones"), against the propounder, Joseph B. McLeod ("McLeod"), on the issue of undue influence by Ms. Jones.[1] I would therefore reverse the order of the trial court granting summary judgment for Ms. Jones on the issue of undue influence and devisavit vel non and remand for trial on the issues of undue influence and devisavit vel non.
*420 "In ruling on a motion for summary judgment, the trial judge does not decide issues of fact but merely determines whether a genuine issue of fact exists." Griffin v. Baucom, 74 N.C.App. 282, 284, 328 S.E.2d 38, 40, disc. review denied, 314 N.C. 115, 332 S.E.2d 481 (1985). "The party moving for summary judgment has the burden of establishing the lack of any triable issue." Purvis v. Moses H. Cone Mem'l Hosp. Serv. Corp., 175 N.C.App. 474, 477, 624 S.E.2d 380, 383 (2006). On a motion for summary judgment, neither this Court nor the trial court may resolve issues of fact and the motion must be denied if there is a genuine issue as to any material fact. Caldwell v. Deese, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975).
In ruling on a motion for summary judgment, "the evidence is viewed in the light most favorable to the non-moving party, and all inferences of fact must be drawn against the movant and in favor of the nonmovant." Koenig v. Town of Kure Beach, 178 N.C.App. 500, 503, 631 S.E.2d 884, 887 (2006) (citations and quotations omitted). The standard of review for summary judgment is de novo. Builders Mut. Ins. Co. v. North Main Constr., Ltd., 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006).
"[W]hether [a party] unduly influenced decedent in the execution of the Will [is a] material question[] of fact." In re Will of Smith, 158 N.C.App. 722, 727, 582 S.E.2d 356, 360 (2003).
[T]he burden of proving undue influence is on the caveator and he must present sufficient evidence to make out a prima facie case in order to take the case to the jury. The test for determining the sufficiency of the evidence of undue influence is usually stated as follows: it is generally proved by a number of facts, each one of which, standing alone, may have little weight, but taken collectively may satisfy a rational mind of its existence.
In re Andrews, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980) (internal citations, brackets, and quotations omitted).
Our Supreme Court has listed seven factors to be considered in deciding the issue of undue influence in the execution of a will:
1. Old age and physical and mental weakness.
2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.
3. That others have little or no opportunity to see him.
4. That the will is different from and revokes a prior will.
5. That it is made in favor of one with whom there are no ties of blood.
6. That it disinherits the natural objects of his bounty.
7. That the beneficiary has procured its execution.
Id. (citation and quotation omitted).
This list of factors "does not purport to contain all facts and circumstances which might suggest the existence of undue influence, and the caveator need not prove the existence of every factor." In re Estate of Forrest, 66 N.C.App. 222, 225, 311 S.E.2d 341, 343, aff'd, 311 N.C. 298, 316 S.E.2d 55 (1984).
In the case sub judice, we must view the evidence in the light most favorable to McLeod, the non-moving party, and draw all reasonable inferences from the evidence in his favor. Koenig, 178 N.C.App. at 503, 631 S.E.2d at 887; In re Andrews, 299 N.C. at 56, 261 S.E.2d at 200-01 (viewing the evidence in the light most favorable to the caveator when the propounder moved for directed verdict on the issue of undue influence). In the case cited by the majority for the list of factors which are probative on the issue of undue influence, Hardee v. Hardee, 309 N.C. 753, 309 S.E.2d 243 (1983), our Supreme Court noted "defendants presented evidence that [the deceased] was alert and aware of what he was doing on the day the deed was executed and had the mental capacity to know and understand the nature and effect of his executing the deed," Hardee, 309 N.C. at 758, 309 S.E.2d at 246, but considered only "[e]vidence in this case favorable to the plaintiff," Id. at 757, 309 S.E.2d at 246, in concluding the evidence was sufficient to submit the case to the jury. Id. at 759, 309 S.E.2d at 247.
*421 Viewed in the light most favorable to McLeod, the evidence tends to prove that the testator was suffering from a terminal illness which included mental weakness related to "multiple lesions in his brain compatible with metastatic disease" as of 1 August 2005. On 28 July 2005, his doctor noted that he was "profoundly weak and confused." Mr. Jones did not know where he was, what month it was, the year, or the name of the president. Dr. Nelson noted that Mr. Jones was "confused and [was] unable to make decisions" and that Ms. Jones was serving as his "surrogate-decision maker." Mr. Jones' medical and prescription medication records indicate that during August and September he was taking multiple pain medications, including methadone and hydrocodone, medications which can "affect a patient's thinking."
McLeod's evidence shows that the testator was confined in the home with Ms. Jones, due to his illness, and subject to "near constant association and supervision." Although other people did see the testator at times, McLeod also presented evidence that at times Ms. Jones limited contact between Mr. Jones and others, even intercepting his phone calls. Some of Mr. Jones' friends who did see him during August and September of 2005 noted that his mental ability declined in this time period and that he talked little during visits. His "attitude and personality were greatly changed" and "his spirit was gone and all of the fight was out of him by that point." At the end of August 2005, Wayne Sinclair, a friend who had witnessed Mr. Jones' March will, visited with Mr. Jones. As he was leaving, Ms. Jones told Mr. Sinclair that the March will which he had witnessed was "totally wrong" because it did not provide enough for her and that she was "going to have somebody look into a new will." Mr. Sinclair told Ms. Jones that he did not read the March will so he did not know its terms, but Mr. Jones had told him that "it was exactly what he wanted." The evidence is undisputed that the September will is different from and revokes the March will, and in addition, changes the general testamentary plan that the testator had since as far back as 1992.
The majority opinion addresses only the first four of the Andrews factors which can apply to this case but fails to address the seventh factor as listed in Andrews, specifically "that the beneficiary has procured [the will's] execution." However, McLeod's evidence indicates that Ms. Jones vigorously procured the execution of the September will. The affidavit of Michael Batts, the attorney who prepared the testator's March will, sets out in detail his communications with Ms. Jones and Mr. Jones regarding drafting a new will. On 5 August 2005, after talking with both Mr. and Ms. Jones together, Mr. Batts asked Ms. Jones to leave so that he could talk to Mr. Jones privately about his will. Ms. Jones left the room, but when Mr. Batts and Mr. Jones completed their conversation and called Ms. Jones back to the room, she repeatedly insisted that she needed to know what they had discussed. Mr. Batts also realized when Ms. Jones returned to the room that Ms. Jones had been able to listen to his conversation with Mr. Jones over a baby monitor in Mr. Jones' room. After Mr. Batts' "private" conversation with Mr. Jones about his will, Ms. Jones followed Mr. Batts out of the house and reiterated her ideas regarding the new will: a simple will, leaving everything to her, and with her as executrix, since she did not need any help administering the estate.
When Mr. Batts mentioned the "possibility of a Will contest as the reason for being very careful" regarding the new will, Ms. Jones told him that she was not worried because she did not think that the employees (the remainder beneficiaries of the trust) even knew about Mr. Jones' March Will and Trust. When Mr. Batts told Ms. Jones that he was pretty sure that they did know, since he had some communications with them about the March Will and Trust, she said that Mr. Jones should never have told them about it, that she did not think they would contest the new will, and if they did, "she would just fire them." Ms. Jones also mentioned to Mr. Batts that Mr. Jones had an affair in 2001 that had "messed up his mind" and that he had changed his will after the affair. The context of her remark about Mr. Jones' prior affair was her statement that she had been "stepped on for too long and *422 was now going to fight for what was hers." She also informed Mr. Batts that "her lawyers had told her that Buck's Will wouldn't have worked anyway, because she would have been able to contest it and get one-half of the company." On 23 August 2005, Mr. Batts noted his concerns that Ms. Jones "is pushing so hard [for the new Will] that he [could not] believe it's [Mr. Jones'] idea." Mr. Batts' concerns were based both upon his knowledge of Mr. Jones' desires in March 2005 to balance benefit to his employees with provision for his wife, as well has his personal observations of and conversations with both Mr. and Ms. Jones in August 2005. Mr. Batts' notes summarized his concerns regarding undue influence as follows: "She's worn him out - with him all day - he's tired - dependent - plans to change `when he gets better' - she called us about his desire to change - won't leave the room, insists on knowing everything said between them - have told them this is asking for a will contest."[2] On Thursday, 25 August 2005, Mr. Batts called Ms. Jones to inform her of his decision not to prepare a new will for Mr. Jones. Mr. Batts' refused to prepare a new will for Mr. Jones based upon his "opinion that the proposed changes to Mr. Jones' March 3, 2005 Will and Trust were actually the desires of Jean Jones, and due to the action of Jean Jones and her insistence in being involved in the proposed changes [he] was unable to determine if the proposed changes were also the desire of Mr. Jones and if he would be signing a new Will and Trust as a free and voluntary act free from any constraint or undue influence." Upon Mr. Batts' refusal to prepare the new will, Ms. Jones immediately sought out another attorney who had not represented the testator previously regarding estate planning issues and thus may have less suspicion regarding her motives. Exactly one week after Mr. Batts refused to prepare the new will, on 1 September 2005, Mr. Jones executed the September will.
McLeod presented evidence as to each of the five Andrews factors which could potentially apply to support a claim of undue influence in this case (as Ms. Jones was the testator's wife and a natural object of his bounty). Although it is not necessary that McLeod produce evidence to support every possible factor which could indicate undue influence, McLeod has done so, and all of the facts "taken collectively may satisfy a rational mind of" the existence of undue influence. In re Estate of Forrest, 66 N.C.App. at 225, 311 S.E.2d at 343 (citation omitted). McLeod's evidence, if viewed in the light most favorable to him, could establish that Ms. Jones exercised influence over the testator in such a way to substitute her desires for his as to the disposition of his estate.
Although the majority opinion discusses some of McLeod's evidence which would support a finding of undue influence based upon four of the Andrews factors, it places more emphasis upon Ms. Jones' evidence which would support a finding that Mr. Jones was not unduly influenced when he executed the September will. For example, the majority states that "Ms. Jones submitted evidence from a well-regarded attorney who prepared the will that the attorney gave independent advice to Mr. Jones, with Ms. Jones not present, stressing that the will had to be consistent with Mr. Jones' wishes." However, if we view the evidence in the light most favorable to the non-moving party, McLeod, we see that another well-regarded attorney, who had previously represented Mr. Jones on his estate planning issues, after extensive consultation with Mr. Jones, refused to prepare a new will for Mr. Jones because of his detailed and well-documented concerns regarding undue influence by Ms. Jones. It is not proper for us to accept as true Ms. Jones' evidence which contradicts McLeod's evidence for purposes of summary judgment. Determining the credibility of the various witnesses - even the two "well-regarded" attorneys-and *423 the weight to give to the evidence is the province of the jury. In re Will of Jarvis, 334 N.C. 140, 143, 430 S.E.2d 922, 923 (1993). Even if Ms. Jones has produced substantial evidence contradicting McLeod's evidence, her forecast of evidence cannot eliminate the dispute as to genuine issues of material fact. Hayes v. Turner, 98 N.C.App. 451, 457, 391 S.E.2d 513, 517 (1990). Because there is a dispute as to the material facts regarding undue influence, and Ms. Jones is not entitled to summary judgment as a matter of law, "the undue influence issue should have been placed before a jury." Id.
Because I would reverse the trial court's order granting summary judgment as to undue influence, I would also reverse the trial court's order granting summary judgment on the issue of devisavit vel non. Accordingly, I respectfully dissent on these issues.

For clarity, I will use the names of the parties in the analysis rather than the terms propounder and caveator. Mr. McLeod is the propounder of the March will, but would be the caveator of the September will. Ms. Jones is the caveator of the March will, but would be the propounder of the September will. Undue influence is alleged only as to the September will.

Mr. Batts' note that Mr. Jones "plans to change `when he gets better'" refers to Mr. Jones' comment that he would "just do what she wants and after I get back on my feet I'll take a look at it again and make sure it's what I want to do." This statement and other evidence indicates that Mr. Jones was at times in a state of denial as to the terminal nature of his illness and that he had an irrational belief that he would have a chance to change his will again after his recovery. At other times he said that Mr. Batts "should just do the Will the way that Jean wanted it and he did not really care what his will provided because he would be gone and it would not be his problem."